JOHN SHONG, Respondent, v. C. E. STINCHFIELD and Atlantic Elevator Company, a Corporation, Appellants.

(183 N. W. 268.)

**Malicious prosecution — probable cause a question for jury.**

1. In an action for malicious prosecution, where the facts are disputed and reasonable men might differ upon the conclusions to be drawn therefrom, the question of probable cause is for the jury upon proper instructions.

**Malicious prosecution — advice of counsel.**

2. One seeking to rely upon the advice of counsel as a defense in an action for malicious prosecution must show that he communicated to such counsel all of the facts within his knowledge and all that he could ascertain with reasonable diligence and inquiry and that he acted on the advice received honestly and in good faith in causing the arrest.

**Malicious prosecution — malice may be inferred by jury from want of probable cause.**

3. Malice may be inferred by the jury from want of probable cause.

**Malicious prosecution — record does not show damages found by jury to have been excessive.**

4. In such action damages awarded in the sum of $2,200 are held, upon the record, not to disclose the influence of passion, partiality, or prejudice, beyond the exercise of a reasonable and sound discretion by the jury and not, as a matter of law, excessive.

Opinion filed April 21, 1921. Petition for rehearing denied June 6, 1921.

Action for malicious prosecution in District Court, Bottineau County, *Buttz,* J.

Affirmed.

*F. B. Lambert* and *J. J. Weeks,* for appellants.

In actions for malicious prosecution and false imprisonment, proof that defendant as prosecuting witness in good faith fully and fairly stated all of the material facts within his knowledge to the prosecuting officer and acted on his advice establishes a case of probable cause. Smith v. Tolan (Mich.) 122 N. W. 513; Baldwin v. Capitol Steam Laundry Co. (Minn.) 122 N. W. 460; Brisley v. Schuls, 124 Wis. 426, 102 N. W. 918.

NOTE.—On the question as to whether probable cause is for the court or jury in malicious prosecution, see comprehensive note in L.R.A.1915D, 1.

The question whether the defendant was protected from a suit for malicious prosecution, when she acted upon the advice of counsel after a full statement of the facts to him, and there was no evidence that she acted maliciously or in bad faith, other than the proof that the plaintiff was acquitted, was one of law for the court. Krause v. Bishop (S. D.) 100 N. W. 434.

"In an action for malicious prosecution, to justify recovery, it must appear not only that the facts would not have aroused belief of guilt in an ordinary mind, but also that the prosecution was malicious." Small v. McGovern (Wis.) 94 N. W. 651.

"Where evidence is undisputed, want of probable cause is for the court." Bulmer v. Reusse (Minn.) 175 N. W. 1005.

*W. H. Adams,* for respondent.

The statement made by the complainant must be a "full and fair statement" of all the facts known to him or that should be known to him at the time. The statement must also be made to the counsel in good faith, and the advice received must be acted on in good faith. Newell, Malicious Prosecution, 310; 20 Cyc. 34–36; Merchant v. Pielke, 10 N. D. 48.

If there was want of probable cause for the prosecution of a criminal action, the law will presume malice. Kolks v. Jones, 6 N. D. 461.

BRONSON, J. *Statement.*—This is an action for malicious prosecution. The jury returned a verdict of $2,200 in plaintiff's favor. The defendants have appealed from the judgment entered and the order denying a judgment *non obstante,* or, in the alternative, a new trial. The facts are substantially as follows:

The plaintiff was employed as the grain buyer and agent of the defendant company, in charge of its elevator, coal, feed, and grain business at Kramer, North Dakota, for about thirteen months from July, 1917 until August, 1918. He was hired at a salary of $60 per month with the understanding, as plaintiff claims, that he was to receive $15 per month extra if he remained in the employment for a year, and, as the defendant claims, $15 per month if he so remained and performed his services satisfactorily. Plaintiff's school education did not extend beyond the third grade. He was poorly versed in bookkeeping. Formerly, he had worked on a farm as a laborer and for a time had operated

a pool room in Kramer. In August, 1918, upon checking plaintiff's business at Kramer the representative of the defendants reported a shortage of approximately $676. This shortage, as reported, consisted of the difference between receipts of wheat and rye, and shipments made; the difference between receipts of corn and millet, and sales made; and the difference between the coal received, determined by the dockage weights in Minnesota upon shipments, and the sales thereof made and the amount on hand remaining, determined by measurement of the bin. This total shortage also included a report upon "sales collected for and undeposited," amounting to $171.57 and a flour shortage of $3.85. In connection with this shortage the plaintiff was credited with an overage, figured likewise with reference to the grain, upon flax, oats and barley amounting to $67.86. The superintendent of the defendant company visited Kramer and the plaintiff and this superintendent made efforts towards collecting upon accounts owing. Some moneys were collected upon these accounts, but there still remained a difference or balance of some $180. Concerning this amount, as the plaintiff testified, he told the superintendent that he did not want to collect such accounts because he owed the parties private debts and had promised them that he was expecting money from the elevator company at the end of the year with which he was going to pay their accounts to the company. It appears that the plaintiff became indebted to various customers of the defendant company upon his personal accounts, such as for rent, for hay, etc. Plaintiff made various sales to such customers of the defendant with the understanding that he would pay such accounts to the company and thus offset his own indebtedness to such customers.

A day book was kept as well as a ledger in which entries were made of sales including the charge accounts and the same were posted into the ledger. These items were rather imperfectly kept. In the ledger appear items of credit to certain customers for indebtedness owing upon merchandise received by the plaintiff. The plaintiff testified that he reported the sales to the company. The amount of plaintiff's money shortage was determined by deducting from the record the total sales made by the plaintiff and the amount of cash remitted by the plaintiff. The representative of the defendant company made various attempts

47 N. D.—32.

to secure settlement of the shortage reported. The plaintiff was re- quested to raise the necessary amount of money to cover the shortage from among his friends. The bonding company upon the plaintiff's bond urged immediate payment of the shortage, in amount, stated to be $670.80. The superintendent of the defendant was urged by this bonding company to take action against the plaintiff by filing information if he failed to fix the matter up. The bonding company stated that they believed an example should be made of some of these fellows who converted other people's money to their own use. Not securing a settlement from the plaintiff, the superintendent of the defendant visited the state's attorney and stated to him the facts of the shortage and signed a criminal complaint charging the plaintiff with the felonious appropriation of money amounting to $171.57. Upon September 23, 1918, the plaintiff was accordingly arrested and brought before a justice of the peace. Upon failure to give bond he was committed into the custody of the sheriff. Within four days thereafter he was released upon furnishing bail in the sum of $1,000. On September 26, 1918, the superintendent of the defendant wrote a letter to the plaintiff to the effect that he would not spend any more time trying to help him and that unless he made settlement in full with him, expenses included, before October 9, he would push the case to the limit and that "nothing goes except the cash." On October 9, 1918, the preliminary hearing was held, and the plaintiff, waiving examination, was bound over to the district court. Thereafter, in March, 1919, upon trial of the criminal action, the plaintiff was acquitted. This action for malicious prosecution has resulted. The record is voluminous; the exhibits extensive. Much evidence was introduced which concerned the method by which plaintiff conducted the business of the defendant and maintained its books. Much testimony, likewise, was adduced on the part of the defendant, in an effort to show that the plaintiff was guilty of embezzlement of the company's property through the manner in which he had conducted this business. No attempt will be made to detail such evidence in its various aspects.

It is undisputed in the record that the company defendant made a mistake in listing the corn shortage against the plaintiff; that in such shortage he was both improperly charged as to weights concerning the corn and also concerning certain corn that was spoiled in shipment

and otherwise. There appears evidence on the part of the plaintiff's witness to the effect that whatever shortage occurred in the handling of the grain, or flour, was incidental to the operation of the company's business, and likewise the overage that accrued. There is evidence concerning the accounts to the effect that the plaintiff did give credit to various customers for property of the company delivered to them, with the understanding that he would apply his indebtedness to such customer's accounts and pay the company. There is evidence also on the part of the plaintiff that he was not paid this $15 per month bonus and was not paid for the two weeks that he worked in August. On the part of the defendant there is evidence to the effect that the plaintiff made some of these sales to customers and made some settlements without accounting to the company upon such settlement with such customers. That he did use some coal and some flour without accounting therefor to the company. That he made admissions that he was short and that he turned over his salary to the plaintiff with reference to his shortage. There is also evidence on the part of the defendants to the effect that they made full and complete statement of the facts to the state's attorney; that in causing the arrest they acted without malice and upon grounds of probable cause pursuant to the requirements of the bond existing between the company and the bonding company. There is also evidence to the effect that the plaintiff did not keep correct and proper accounts of sales made and did not list fully sales for cash or sales on credit, and that the books of the company as kept by the plaintiff showed distinctly a shortage on the part of the plaintiff. Plaintiff on the other hand offered evidence in contradiction of such evidence.

*Decision.*—The defendants contend principally that the record discloses, as a matter of law, absence of malice, probable cause, and a full statement made of the facts and circumstances of plaintiff's shortage to the state's attorney. It is also contended that the verdict is excessive. This court has heretofore held that malice may be inferred by the jury from want of probable cause. Kolka v. Jones, 6 N. D. 461, 66 Am. St. Rep. 615, 71 N. W. 588. That probable cause becomes a question of law alone when the facts are undisputed and then only when the record discloses that the plaintiff acted in the belief that he had probable cause. Ibid.; Comeford v. Morwood, 34 N. D. 276, 158 N. W. 258. This court has further held that one who seeks to rely upon the

advice of counsel as defense must show that he communicated to such counsel all of the facts within his knowledge and all that he could ascertain with reasonable diligence and inquiry and that he acted on the advice received, honestly and in good faith, in causing the arrest. Merchant v. Pielke, 10 N. D. 48, 84 N. W. 574. In connection with these contentions the defendants maintain that the evidence in the record, including particularly admissions made by the plaintiff, demonstrate that the plaintiff was guilty of embezzling the company's property and that this shows affirmatively the existence of probable cause for the prosecution maintained. We are unable to adopt defendants' contentions in this regard. The gist of plaintiff's action, after proof that the criminal prosecution terminated in his favor, was to establish that such prosecution was malicious, without probable cause, and resulted in his damage. Ibid. The questions therefore in this dispute in the evidence were sufficient to form a question of fact for the jury. Likewise, there exists a dispute concerning the facts and circumstances that the defendants' representative knew, or that, in the exercise of reasonable diligence, he ought to have known when he made the statement to the state's attorney, and, accordingly, the question of whether the defendant communicated all the facts within his knowledge or all that he should have ascertained with reasonable diligence and inquiry, were questions of fact for the jury. The trial court fairly submitted thees questions to the jury. The findings thus made by the jury do not warrant this court, upon this record, in determining, as a matter of law, that there existed neither malice nor want of probable cause.

The damages awarded appear large. There is evidence, however, that the plaintiff, in the defense of the criminal action, incurred expenses aggregating $650. The trial court properly instructed concerning the questions of damages. The award of damages was peculiarly for the determination of the jury, in the exercise of a reasonable and sound discretion, unless the record discloses the influence of passion, partiality, or prejudice. We are not prepared to hold, as a matter of law, that the record so discloses. Ann. Cas. 1916C, 251; Merchant v. Pielke, supra. The judgment and order are affirmed with costs to the respondent.

CHRISTIANSON and BIRDZELL, JJ., concur.

GRACE, J. (specially concurring). We are of the opinion, that the evidence clearly establishes want of probable cause.

In the case of Rhoads v. First Nat. Bank, 37 N. D. 421, 163 N. W. 1051, it was held that malice may be inferred where want of probable cause is proved.

We agree, as, in substance, is stated in the main opinion, that the verdict is not excessive, and that the record does not disclose the influence of passion, partiality, or prejudice.

ROBINSON, Ch. J. (dissenting.) In the administration of the law the first duty of a court is to prevent one party from robbing another. On a complaint for embezzlement the plaintiff escaped by the skin of his teeth and a mistake by the state's attorney. Then in this action for malicious prosecution he recovers a verdict for $2,200. The complaint and the information made no charge against the plaintiff, only embezzlement of money to the amount of $171, whereas the proof tends to show only an embezzlement of property. The ordinary layman may well be excused for not knowing the distinction between an embezzlement of money and of goods and chattels, but, on the record, it does not appear that the state's attorney had any excuse for drafting the complaint and the information as he did for the embezzlement of money. Nor does it appear that he had any excuse for drafting the information and going to trial without any evidence to show a conversion of money. He was the person who had sole charge of the criminal prosecution. He drafted the complaint, which was dated September 12, 1918, and he drafted the information, dated February 17, 1919. Between those two dates he had plenty of time to investigate the facts. In March, 1919, he conducted the prosecution before Judge Buttz and a jury, and, of course, it resulted in a verdict and judgment of acquittal.

Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted. Comp. Laws, § 9929.

Sec. 9936: "A distinct act of taking is not necessary to constitute embezzlement, but any fraudulent appropriation, conversion, or use of property coming within the above prohibition is sufficient."

Sec. 9939: "The fact that the accused intended to restore the prop-

erty embezzled is no ground of defense if it has not been restored before a complaint has been laid."

Now in this case while the plaintiff did not embezzle money of the corporation that employed him, it does appear that he did what is known as a crooked business, to which he was tempted and almost forced by his poverty. He was twenty-seven years old; he had a family of three children and a wife. He lived with them in Kramer. He had a salary of only $60 a month, which he accepted because his pool business had played out, for it was a lean year in which it did not pay to keep the elevator open and it took in only three carloads of wheat. So it appears the plaintiff became indebted to several of his relations and other persons and apparently stood them off or liquidated his own debts by selling them property of the elevator company and promising to pay the company.

In that way he used the property of the company to the amount of $171. He says: "I charged them with the flour, coal, and stuff just as though I had no account with them myself, but I made a verbal agreement with them that at the end of my year in the elevator I would pay their account, because I figured that I would be getting in the neighborhood of $200 from the elevator company, and I was short and I wanted to pay these fellows. In that way they could get their bills straightened up and I got my money. But I left their account just the same with the company and reported to the company as though they never owed me a cent."

When the complaint was made the accused waived examination and gave bail. Then he went around, saw his friends and creditors and tried to induce them to pay their debt to the company on assurances that he would pay them. The complaint and the arrest was the natural result of crooked business. The case presents three questions: (1) Was the prosecution malicious? (2) Was it without probable cause? (3) Is the damage excessive?

*Malice is the very essence of the action.* The lack of probable cause is of no consequence only as it is evidence of malice. " 'Malice' and 'maliciously' import a wrong wish to vex, annoy, or injure another person or an intent to do a wrongful act." Sec. 10,360. Malice is a condition of the mind or the head, and not of the foot. Where there is no mind there can be no malice or intent. A corporation has no mind.

It is a legal entity, existing only in the contemplation of law. Hence it cannot be guilty of malice. True it is said that most of the decisions are to the contrary. 18 R. C. L. 45. But there is no good reason why this court should follow such wrong decisions and pile error upon error. The statute is that "Malice imports a wrong wish to vex or injure a person." Hence, where there is no such wish or intent, there can be no malice. Thus it is that idiots, lunatics, and mere corporate entities having no mind, cannot be guilty of malice, though they may be guilty of torts not requiring an act of the mind. That is self-evident. It is as clear as any axiom. The making of the complaint was not the act of the corporation or its directors. There is no evidence that any director knew of it. It was the direct act of the state's attorney, who advised it, and of the person who signed it, and there is not a scintilla of evidence that he was actuated by malice. On the contrary, it appears that he was a stranger to the defaulting elevator agent and gave him every opportunity to pay his confessed shortage. He consulted the law officer and was advised to make the complaint. There is a wrongful assumption that his statement to the prosecuting officer was not full and fair, but such is not in accord with the evidence or the presumptions; and, of course, the complainant did not have before him all the mass of stuff submitted as evidence to this court. And we may fairly assume that after reading such evidence and exhibits, which would require at least three days, no two judges would agree as to a full and fair statement of the same. Besides it appears that the agent had kept his books in such a way as not to disclose the real nature of his questionable transactions. The books do not show how he sold the property of the company to get credit or to stand off his creditors. That was a new device. Manifestly if the agent had kept his books right and had done a straight, honest business, there would have been no occasion for a criminal prosecution against him.

The criminal complaint, as drafted by the state's attorney, was signed and sworn to by the defendant, C. E. Stinchfield, the superintendent of the company. So far as the evidence shows, the complaint was made in good faith, and not maliciously. The complainant was not a lawyer and he did not retain private counsel. He went to the state's attorney and to him stated the case. As he had no reason for making a wrong statement, the presumption is that he made a fair and honest statement

of the facts as understood by him.  He stated the facts as he had
learned them from the plaintiff and the meager records kept by him.
The facts did show a misuse of the corporate property, but not a con-
version of money.  There was probable cause for believing that a public
offense had been committed, but the offense was not properly charged in
the complaint or in the information.  However, that was not the fault
of the complainant.  Had the complaint and the information been
properly drafted, the facts as proven would have sustained a verdict
of guilty; but, under all the circumstances, the chances are that a jury
would not have found a verdict of guilty under any complaint or any
true testimony.  And still there was probable cause.  The complaint
against the defaulting agent was only for the embezzlement of money.
If there was no probable cause that he had embezzled money or prop-
erty, why did he waive examination and give bail; why did he not stand
a preliminary hearing before the magistrate and defy the prosecution?
It must be that he feared the result of an examination.  His shrewd
counsel must have feared that he might be held for the embezzlement
of property, though the charge was not in the complaint.  Of course he
did not fear the charge of embezzling money.  Hence he waived an ex-
amination and invited a trial on the false charge.  In that way he did
entrap or deceive the prosecuting attorney who filed an information for
the embezzlement of money only and went to trial in a haphazard way
without any investigation of the facts.  It is not the duty of the state's
attorney to prosecute an innocent person, or any person, without prob-
able cause.  His duty was to make a full investigation and inquiry into
the facts touching the alleged crime.  Sec. 10,629.  And in case it ap-
peared that no offense had been committed, it became his duty to refuse
to file an information.  Sec. 10,630.  In this case the duty of the state's
attorney was to examine the books, to inquire into the matter, to hear
both sides of the case and to refuse to file an information for the em-
bezzlement of money when there was no evidence to sustain it.

The verdict of $2,200 is not merely excessive.  It shocks the con-
science and it has no support in the evidence.  If the defendants had
not appeared and conducted the trial in a tactless way, it is quite cer-
tain that such a verdict would not have been given.  But on the trial,
by overzeal, counsel for defendants made a mountain out of a molehill,
cross-examined the accused agent till he became a kind of martyr, pro-

tracted the trial, putting in evidence countless and confusing exhibits and a mass of testimony. It was enough to swamp the real and simple merits of the case.

However, it is entirely clear that the primary fault was with the agent; he has not been slandered or maligned; and so far as he did a crooked business, it was proper to expose it to the light of truth. That was not a legal injury. Aside from that he suffered no injury, because he waived examination before the magistrate and invited a trial on a false issue, the embezzlement of money. On that charge there was no proof—and he knew it. There was no need of counsel to defend him. There was no reason for incurring any expense, and before any expense was incurred, he had every opportunity to settle the matter by paying his shortage, $171, or by inducing his friends to pay for the coal, feed and other property of the company which he had sold them to set off or liquidate his own debts, promising to pay the company for its property.

The trial, both of this and the preceding criminal action, was made in reality a burlesque, and though the lawyers were the principal actors, the trial judge did his part. He magnified this case and made of it a grave matter. He gave the jury a charge of over 3,000 words and gravely cautioned them against finding damages in excess of $10,000. The wonder is that the jury did not resolve in favor of the Plumb plan and solace the defaulting agent by an award of the Atlantic Elevator. Assuredly the judgment should be reversed and the action dismissed.

On Petition for Rehearing, Filed June 6, 1921.

BRONSON, J. Two juries through their verdicts have held respectively; the first jury, that the plaintiff was not guilty of the crime of embezzlement, and, the second jury, that there existed no probable cause to warrant belief of the embezzlement of either money or property. This appeal is before this court for a review of errors alleged to have been committed upon the trial of the civil action. Our chief justice has presented a dissenting opinion upon the determination made by this court and a further dissenting opinion upon the petition for rehearing. The appellants have filed an extended petition and supplemental petition for rehearing. From these dissenting opinions and the petitions one might well infer that this cause is presented to this court both upon the

law and the fact as a trial *de novo*. This court, sitting to review the errors specified, must review the error specified upon the record. It is not the function of this court, in this appeal, as apparently appears in the dissenting opinion of our chief justice, to adjudge guilty, both the state's attorney of failure to properly perform his duty, and the plaintiff of the crime of embezzlement. Not thus may one so be condemned and convicted. The right of trial by jury still remains in the state.

The state's attorney in the criminal action, who is one of the attorneys for the defendant has an honorable record before the courts of this state as a lawyer. The jury, by a verdict, have found that there was not a full disclosure of the facts made by the complaining party to this state's attorney. The record amply warrants this holding.

Our chief justice asserts that the jury made no such finding and that our opinion does not attempt to show wherein the defendant failed to make a full disclosure. A mere inspection of the record answers this assertion. The court charged the jury: "So, that if you believe in this case that the defendant Stinchfield made a full, fair, and honest statement of all the facts in the case as were known to him, or believed by him to exist, and that upon such statement he received advice from the state's attorney that he had good cause for making complaint against the plaintiff, then, I charge you that the plaintiff *cannot recover* in this law suit."

The jury found that the plaintiff could and was entitled to recover. Necessarily, the jury found that the defendant did not make a full and fair disclosure of the facts. This court has heretofore held that one who seeks to rely upon the advice of counsel as a defense must show that he communicated to such counsel all of the facts within his knowledge, and all that he could ascertain with reasonable diligence and inquiry and that he acted on the advice received honestly and in good faith in causing the arrest, and that further, to obtain the protection which the advice of counsel affords, it is not enough to prove generally that all the facts were laid before him. The proof must show what facts were communicated, so that it may be seen whether the presentation was full and fair. Merchant v. Pielke, 10 N. D. 48, 53, 84 N. W. 574. Whether there has been a full and fair communication to counsel is a question of fact for the jury. 26 Cyc. 111. The dissenting opinion of the chief justice, of itself, shows that there was neither a full nor fair disclosure

of the facts made by the defendant to the state's attorney. So faulty was it, that the chief justice terms the criminal prosecution a mere fiasco. So flimsy was it, that the chief justice states that there was no reason for employing counsel to defend against it. Yet, the fiasco resulting, if such it may be termed, was occasioned through the disclosure of facts as stated by the defendant to the state's attorney, supposable facts which it then knew or ought to have known. The chief justice states that it was the duty of the state's attorney to examine into the charges and either to approve or disprove the issuing of the warrant, to refuse to sanction a prosecution without probable cause, and that the presumption of law is that he did his duty. The state's attorney did issue this warrant. The chief justice avers that the complainant did make a fair, honest statement of the case. Yet he avers that there was no excuse for drafting this information against the plaintiff herein and going to trial without any evidence to show a conversion of money. No showing exists in the record nor does the chief justice assert that the state's attorney acted upon other or different information than he received from the defendant. The state's attorney testifies that he acted upon the information furnished by the defendant. The criminal prosecution had, as the chief justice argues, was without probable cause. Manifestly, if the defendant had made a full and honest statement of the facts to the state's attorney, no prosecution upon the criminal charge of embezzling money would have resulted. For, as the chief justice asserts, the presumption is that the state's attorney did his duty. Thus does our chief justice blow both hot and cold upon the contentions of a full and fair statement made to counsel. Wherein did the defendant fail to make a full disclosure of the facts? A few illustrations will suffice: The chief justice quotes the argument of the state's attorney (one of the attorney's for the defendants herein) viz:—"The confessed shortage of $171.57—the money shortage was determined by deducting from the record of sales made the amount of cash deposited and the accounts outstanding as reported by the plaintiff. The plaintiff was charged with the total sales, then credited with the cash deposited and the accounts outstanding as reported by him." At the trial, the state's attorney testified:

"A. Mr. Stinchfield told me that he wanted to make a criminal complaint against their agent at Kramer, Mr. John Shong, and I

asked him what the case was, what it was about; he says, he was short over there and I asked him how much could be proven or something to that effect, what the evidence was, how he knew he was short and he told me they had the records and reports that he had to make and did make of all his sales; they also had the records of his deposits of cash that he had received and statement of all the outstanding accounts that Mr. Shong claimed to have and from those statements that he figured he was short in cash something like $170 or $180, I don't know the exact amount, I believe the exact amount was stated in the criminal complaint. Mr. Stinchfield also said that when he had figured this up with Mr. Shong, Mr. Shong had told him that he was short, made that admission he says; that is the substance of what he told me."

The state's attorney further testified, in response to the question whether Stinchfield had a statement showing the amount of the various shortages, that he would not be certain; that he thought perhaps he did; that the only thing he was interested in was the shortage of money. He further testified that he did not remember whether he (Stinchfield) told him that Shong claimed the company was indebted to him for wages in the sum of $120. The defendant, Stinchfield, as superintendent of the elevator company, testified that when he signed the criminal complaint he did so under instructions from the elevator company and the bonding company. In response to a question to tell the jury everything that he told Mr. Weeks at that time, he stated that he introduced himself, and told Mr. Weeks that he had a criminal complaint to make; that he wanted to swear out a complaint against Mr. Shong, and he gave him a statement of the facts that he had; 'that he wanted a warrant for this man; that he told Mr. Weeks it was a shortage of $171.57 in cash; that Mr. Shong had embezzled; that Weeks wanted to know if he had the evidence and he told him he had; that he laid it before him, and the state's attorney, after looking it over, said, there was no question but what he had the proper evidence so far as he could see and he issued the warrant; that he laid all the evidence that he had from the Atlantic Elevator Company before him as to any money shortage; that this evidence was "a statement gotten out showing what he was short and it was the shortage of the difference between, the difference here in his sales accounts and his deposits and nothing to cover the difference;" that this statement showed a short-

age of $182.57 and that he wanted a warrant for $182.57; that at that time there was an error of $11 which he had not noticed. (It is here to be noted that this $11 error consists of two accounts, Perry $8, and Schultz $3, which Stinchfield authorized plaintiff to charge off as bad accounts. These two accounts were in the list of eleven accounts which aggregated over $182, and which in amount covered the shortage in money claimed; evidently Stinchfield knew something about these accounts.) He also testified that he told the state's attorney that Shong admitted that he was short and that he used the money. In this connection the testimony of Stinchfield himself is significant. The chief justice asserts that because plaintiff testified that he did not show the ledger to Stinchfield that thus he was keeping Stinchfield in the dark. Stinchfield, on cross-examination was asked if he made an examination of this small ledger at that time, referring to the time when plaintiff was checked out in August, 1918. He answered:

"Not at that time.

Q. "When did you examine it last?  A. *In April.*"

Q. "As a matter of fact that ledger shows at least some of these accounts that he claims existed, does it not?  A. Possibly, but he was not keeping his book up, and it was no authority to me as to whether the accounts were correct or not."

Q. "You didn't take the trouble to make an examination of it at all? A. No, Sir."

Thus is plaintiff corroborated that he did not take statements from that ledger; that such book was never a full account of the outstanding accounts. Thus is it shown that Stinchfield knew about this ledger; and knew or had the means of the knowledge of its contents, and, further, that Stinchfield did not check up; through this ledger; it was unnecessary; the sales slips and the day book, each spoke for themselves; the sales slips showed either cash or charge sales. The question as to whether Stinchfield made a full, fair and honest disclosure of the facts to the state's attorney, as a matter of law, upon this record answers itself. It is apparent that Stinchfield went to the state's attorney for the purpose of getting a criminal warrant for the arrest of the plaintiff for embezzling money. He did not first lay the facts before the state's attorney. First he stated that he wanted a criminal warrant. He even asserted to the state's attorney that Shong admitted that he had

embezzled and had used money. In accordance wih Shong's testimony which was for the jury, and which testimony apparently they believed, this was not true and Shong had not admitted that he had embezzled or used the money, and assuredly upon this record it was false to state or assert that plaintiff had embezzled the company's money. This first was a disclosure found not true. Again he did not disclose to the state's attorney concerning the claim of Shong that the company owed him money. Further, he did not disclose to the state's attorney the facts as disclosed in the record that the sales made were evidenced by sales slips showing the date, the party to whom sold, and the merchandise sold, and that these sales slips were sent to the home office or were supposed there to be sent. He did not disclose to the company that sales which were made not for cash were shown by these sales tickets, by entries upon the day book and to some extent by charges entered in the small ledger. He did not disclose to the state's attorney concerning customers' accounts as shown by the sales slips on the day book, and in the small ledger wherein entries of credit were made by the plaintiff for accounts that he owed such customers or in explanation concerning such entries. He apparently did not disclose to the state's attorney the list of the accounts receivable such as could have been readily ascertained if he did not already know them from the day book, the ledger, and the reports made by the plaintiff to the home company. The statement concerning which Stinchfield testified did not pretend to have any list of accounts receivable. It was a statement prepared or submitted by defendant which showed and claimed a shortage of over $600. The shortage with reference to coal, wheat, rye, flax, oats, barley and millet was not a shortage claimed through malefaction, but a shortage or overage, as the case might be, in fact, in business operations. And in this regard no disclosure or statement is made to the state's attorney. The claimed shortage in corn was false, so the record discloses; the shortage reported on accounts was claimed, as if plaintiff had collected for the accounts and not deposited the moneys; yet even then Stinchfield knew, or ought to have known, that it was false to charge the plaintiff with embezzlement of $11 which represented two admitted bad accounts.

Furthermore, Stinchfield testified that when he was checking up in June, 1918, for the cut off that there was not enough to cover the sales

as the sales amounted to, including the outstanding accounts which were on statements, that he had some statements of accounts in the drawer. Subsequently when he was at Kramer again he went around with the plaintiff and collected some accounts. The shortage then was figured around $180. The plaintiff said that he had accounts for that but did not want to collect them as he owed these parties private debts and was expecting money from the elevator company at the end of the year with which he was going to pay their accounts with the company. These accounts are in evidence. Exhibits 632 to 643 inclusive. Including the account of the plaintiff which was $37.84, they total over $218 eliminating plaintiff's account, they total a little over $180. With two accounts eliminated which were admitted bad by Stinchfield such accounts amount to a little over $170, approximately the amount of the claimed shortage. In the evidence in response to a question by the court, the defendant's attorney admitted that these accounts were what made the difference in cash. These accounts, as plaintiff testified, had been reported to the company. Again Stinchfield did not make a disclosure of these facts to the state's attorney. Furthermore, plaintiff testified that Stinchfield when he came there August 1st, got the sales slips so that the company was in a position to know the outstanding accounts in connection with plaintiff's previous monthly reports. Manifestly, it is assuming much to state upon such disclosures that, as a matter of law, Stinchfield made a full honest statement to the state's attorney.

Assuredly, the question of whether the defendant was in good faith trying to enforce the law upon a full presentation of the facts, or was acting maliciously for purposes of compelling a settlement in cash by the plaintiff upon its own figures as submitted to him, was for the jury.

But the contention is strenuously made in the petitions for rehearing and in the dissenting opinions that the plaintiff is an admitted embezzler of property and that therefore there existed probable cause for his arrest. We are firmly of the opinion that the record warrants no conclusion by this court, as a matter of law, that this plaintiff was an embezzler of property, either through his own admission or upon the record testimony.

The defendant placed in charge of its elevator this young man, with meager education and without any experience in book-keeping methods

or as a business man. The book-keeping tools that were furnished to him consisted of a cheap form of day book, individual blank sales tickets (to be sent to the general office with his reports), covering individually flour and feed, coal, and grain. Blanks were also provided for a weekly report for flour and feed sales, coal and wood sales, and grain and sundry sales. Also a blank for a monthly report showing a list of accounts receivable, etc. When sales were made sales tickets were likewise made. In accordance with plaintiff's testimony, when cash sales were made, the sales slips were marked paid. Some of these tickets are marked "paid," some charged, and many without any such notation. In this day book entries of charge accounts and, to some extent, of payments were made.

There was also a small ledger (size 6 by 9 in.). The plaintiff claimed in his testimony that this book never belonged to the company, that it was turned over to him, not by the company but by the agent who preceded him, who bought it for his private use; that it was not kept for the records. The defendant maintained to the contrary. A cursory checking of the books discloses that all charges in the day book to individuals were not carried or posted into this small ledger. It is a book that concerns alone individual accounts charged.

The books were poorly kept, as might readily be expected. The chief justice in his dissenting opinions cites the Herman Thiel and Louis Sunnburg accounts to illustrate the manner in which the plaintiff did business and as illustrative of his method of embezzling the company's property. It is well to consider these accounts. In the Herman Thiel account, the item of July 16, 1917, for $6.50 is evidenced in the company's record by a sales ticket issued that day for flour and is shown in the day book. The next item of July 16, is likewise evidenced by a sales ticket issued that day for coal and is shown on the day book. The item for $35 is against evidenced by a sales ticket issued on August 1, 1917, for flour and feed and is shown in the day book. Likewise, the credit item of August 2d, for $2.25 is shown on the day book. These sales tickets, in accordance with plaintiff's testimony, were sent to the company. The $45 item (paid to myself by rent) is not shown on the day book. It is not claimed or asserted that the plaintiff reported to the company that this $45 item was paid or collected. The plaintiff does claim that he used this book as a personal

memorandum book and did make arrangements with various customers to pay their accounts to the company. In accordance with this ledger, apparently, the agent of the company who preceded the plaintiff did likewise because this very Herman Thiel account shows a credit on April 2, 1917 (before the employment of plaintiff) to wit: by house rent March, $10. Plaintiff further testified that he did not deliver these sales in payment of his own bills. Thus does the plaintiff deny delivery of company coal to pay house rent. Upon the books, accordingly, the defendant had notice of this Herman Thiel account, of its amount, and the liability of the plaintiff therefore either for cash to be paid by the plaintiff himself or to be collected from Thiel. It is to be noted here again that Stinchfield testified that he saw this ledger in April, 1918. This does not disclose, as a matter of law, property embezzlement. On June 15, 1918 (Exhibit 314) plaintiff sold to himself, as evidenced by a sales slip not marked "paid," barley in the amount of $31.45. This again, does not disclose, as a matter of law, property embezzlement.

The Louis Sonnenberg account. The item in the dissenting opinion stating, "Amount of sales $79.20," is evidenced by various items in the small ledger aggregating $79.20. These various items are each evidenced by sales slips for flour and feed or coal. Three items are entered in the day book for corn. (There exists in the record apparently no individual sales slip for corn sales.) There are, however, sales slips issued to Louis Sonnenberg that are not shown in this little ledger, namely, Dec. 12, 1917, for coal, $5.90; Apr. 27, 1918, for flour, $6.70; June 3, 1918, for flour, $4.55 (Exhibits 336, 529, 547). The credit, March 13, "by check $51.15" appearing in the ledger, is not shown in the day book. Likewise an anterior credit dated Dec. 20, 1917, "by check $39.50," which balanced a previous account, is likewise not shown in the day book. The $20 item of March 13, 1918, was for hay that the plaintiff purchased from Sonnenberg; it is not credited on the day book. There is no claim or assertion made that the plaintiff embezzled either the check for $51.15 or the anterior check for $39.50. Again this transaction does not show, as a matter of law, that the plaintiff embezzled or intended to embezzle any company property. The books and the records, likewise, were irregularly

47 N. D.—33.

and imperfectly kept, but the system of the defendant was to charge the plaintiff with the property that he had received and to make him account for such property; this is shown by the defendant's attempt to hold the plaintiff responsible for a corn shortage which resulted partly from an improper price charged to the plaintiff and, partly, from the spoiling of the corn. The record does not disclose that the plaintiff concealed by the manipulation of the books any sales of merchandise whatever. If the plaintiff had kept these personal items of credit entirely absent from this small ledger which he claimed himself to be partly a memorandum book, and kept an account of the same in a separate little personal book until settlement day with the customers, of the company, little attempt would probably have been made to claim that plaintiff was guilty of embezzling property.

Our chief justice quotes some of the testimony concerning the plaintiff's testimony about the entries in the small ledger. He states that this served to keep Stinchfield in the dark; that this testimony served to show that the plaintiff embezzled coal. The conclusion is further drawn that the plaintiff was doing a crooked business. There is testimony in the record, however, that the amount of these accounts for which shortage was claimed was evidenced upon the records of the company by charges made to customers for each item of merchandise with sales slips for each of such articles that were reported to the company. Certain it is that these outstanding accounts amounted to the shortage for which the defendant desired a criminal prosecution upon the theory that the plaintiff had collected and appropriated the money therefor. There is evidence in the record that Stinchfield was told about these accounts by the plaintiff. There is evidence further that Stinchfield himself and plaintiff proceeded to collect some of these accounts. An account was collected from Sonnenberg; another, from plaintiff's mother; another from Redlaczyk. Stinchfield knew about the Kretchmar account. All of these accounts were in the list that accounted for the claimed shortage of $170. At that time before the arrest the plaintiff was claiming $180 due him from the elevator company for back pay in accordance with their agreement. The amount of the accounts totaled about $180. Stinchfield knew about these accounts and was told about the arrangement that plaintiff had made for paying some of these accounts. No attempt was made to conceal

this arrangement either by withholding the daily slips of merchandise sales or by concealing the arrangement of plaintiffs bills to defendants' customers. The jury were warranted, in our opinion, in finding as they did that the plaintiff had neither intent nor desire to embezzle plaintiff's property. On this feature, the court fully charged the jury as follows:

"If Mr. Shong was actually guilty of having embezzled either money or property of the company there was probable cause for the criminal prosecution. If you find that the defendants in this lawsuit, because of the conditions of the records kept by the plaintiff, were unable to say definitely whether the plaintiff had embezzled money or property of the Atlantic Elevator Company, and acted in good faith in charging the plaintiff with embezzlement of money, and proofs on the criminal trial showed it was property instead of money that was embezzled, and plaintiff was guilty of embezzlement in that form, then, in that case, you are instructed that there was probable cause for his arrest, probable cause existed for his arrest on the charge of embezzlement of either money or property, and your verdict must be for the defendants for a dismissal of this action. If you find from the evidence in this case that Shong did not disclose to Stinchfield the outstanding accounts which he now claims were coming to the company, or any of such, so that on balancing his accounts there appeared to be a money shortage, then Stinchfield and the company would have had probable cause for believing Mr. Shong guilty of having embezzled funds to the extent of that apparent shortage, even though it may now appear there was no shortage in fact."

The chief justice is assuming erroneously that this court is determining that there was want of probable cause to believe the accused guilty of embezzlement. Such is not the case. This question upon this record was for the jury, and the jury have found that there was want of probable cause by their verdict. This court has reviewed the record and in the opinion of the majority it has found, as a matter of law, that the jury did not err in so doing.

In point of fact, if these accounts, amounting to over $170 were accounts of the company, collectable as such, there was no shortage. The company did attempt to collect them and did make collections therein. These facts were for the jury. In point of fact, further,

there was no shortage on plaintiff's part in any event if the company did owe him as he claimed $180 for back pay and in addition two weeks' wages in August, 1918. It is apparent that the defendant was acting upon the theory that it was the duty of the plaintiff to account to the defendant for any shortages of grain bought and for any short- ages of coal or flour and feed sold, determinable through the gross re- ceipts and gross disbursements, and that, if he failed so to account, he was guilty of embezzlement of money. Apparently, afterwards, when it appeared from this small ledger that the plaintiff was making settlements with customers through an exchange of debts, with the promise to pay the amount of plaintiff's personal debt to the company, the claim then was asserted that the plaintiff was embezzling the com- pany's property.

Upon the entire record we are satisfied that the findings of the jury should not be disturbed. The jury evidently found, through the ver- dict rendered, that the defendant through malice and acts of oppression attempted to take advantage of plaintiff's ignorance and inexperience; that the plaintiff, thus assaulted and charged with crime, did not meek- ly submit but chose to fight and defend his reputation. The record discloses much publicity resulting to the effect that the plaintiff was guilty of a shortage with the defendant. He was deprived of his lib- erty for several days; his ability to secure employment was affected. The plaintiff has testified that he incurred expenses of $650 in defend- ing the criminal action.

The chief justice asserts that the verdict $2,200 rendered is not merely excessive but that it shocks the conscience and has no support in the evidence. It is well to answer such assertion by his own opin- ion in the case. Huber v. Zeisler, 37 N. D. 556, 562, 164 N. W. 131. In that case the plaintiff was arrested upon the criminal charge of adultery. He was a married man, forty-eight years old with seven children. The record does not disclose that he was deprived of his lib- erty. Special damages including proof of attorneys' fees of $500 and of other expenses aggregating the total sum of $850 escaped without any comment by our present chief justice that such fees were exorbi- tant or that the case was a contingent fee case. There is no issue or facts in this record concerning contingent fees. The chief justice in that case had no hesitancy in stating that the verdict was far from be-

ing excessive; that it might well have been for $5,000. The court unanimously held in that case that the verdict was not excessive. We find in this case that it is not excessive as a matter of law. Apparently, in the former case our chief justice recognized the philosophy of Iago in Othello: "He that filches from me my good name robs me of that which not enriches him and makes me poor indeed." Likewise, he might recognize in this case.

We should all be able to agree that, upon this record, the jury, as triers of facts, were warranted in concluding that the defendant without reasonable excuse or probable cause accused the plaintiff of the embezzlement of money; that unconscionably it attempted to collect from him a claimed corn shortage that was wrong and improper. That unconscionably it threatened the plaintiff with criminal prosecution unless he paid all of the claimed shortage together with expenses. See Rhoads v. First Nat. Bank, 37 N. D. 421, 437, 439, 163 N. W. 1046.

The justification for this too extended opinion is based upon the necessity of answering small excerpts of the testimony quoted in the dissenting opinion and the broad conclusions drawn therefrom, and to demonstrate, in a manner that a large record of evidence, with a multitude of exhibits, all submitted to a jury, must not be judged and determined by fragmentary quotations therefrom. The petition for rehearing is denied.

CHRISTIANSON and BIRDZELL, JJ., concur.

On Motion for Rehearing.

ROBINSON, Ch. J. This is a contingent fee case. The plaintiff sues to recover $10,000 for a malicious prosecution and recovers a verdict of $2,200. The contingent fee business is becoming more and more demoralizing. It leads the lawyer into temptation; it tempts him to undertake desperate and unconscionable actions, to fix or unduly influence witnesses and jurors and to pervert justice.

This case presents a gross miscarriage of justice. Indeed it might well be acted on the stage as a burlesque on the lawyers and the court procedure. In July, 1917, at Kramer, in Bottineau county, the plaintiff was employed as agent of the elevator company to sell coal, feed,

and flour.  At the end of the year he had made default in the sum of $171, by using the property of the company for his own purposes. He may have intended to pay the company, but he failed to do it.  He is arrested for embezzling $171 in money, waives examination, gives bail, goes to trial and in ten minutes, more or less, is acquitted because the proof showed or tended to show only an embezzlement of chattels, and not of money.

In the next act the plaintiff brings an action to recover $10,000 for malicious prosecution, and obtains a verdict for $2,200.  He claims that in defending against the criminal prosecution he incurred expense to the amount of $650, and in the majority opinion as written by Mr. Justice Bronson, it is said: "There is evidence to that effect," and casts the responsibility on the jury.  But there is no credible evidence to show that the plaintiff ever paid or incurred any expense, except as he may have agreed to divide the recovery with his attorney.  The criminal prosecution was of his own seeking.  It was a mere fiasco, a ridiculous failure.  There was no reason for employing counsel to defend against it or against any prosecution without probable cause. But, as it seems, the plaintiff or his counsel wanted a criminal prosecution to lay the foundation for this suit.

When arrested, he did not, like an innocent person, go before the magistrate and challenge proof of his guilt.  He waived the proof, waived an examination, and of course the natural inference was that he had reason to fear the result of an examination.

On September 12, 1918, two months after the discharge of Shong by the company, the complaint was made to the state's attorney.  He drafted the complaint against Shong "for the embezzlement of money amounting to $171.57."  Then he made on the complaint this certificate:  "The complaint and evidence having been submitted to me, I hereby approve the same and the issuance of a warrant.  J. J. Weeks, state's attorney."  It was the duty of the state's attorney to examine into the charges and either to approve or disapprove the issuing of a warrant.  Comp. Laws, § 10,535.  The presumption of law is that he did his duty.  He says: "The confessed shortage of $171.57—the money shortage—was determined by deducting from the record of sales made the amount of cash deposited and the accounts outstanding as reported by the plaintiff.  The plaintiff was charged with the total

sales, then credited with the cash and the accounts outstanding as reported by him." "But when Shong took the stand in the criminal action he produced certain statements of account against his friends that were not credited in the books of the company to an amount about equal the money shortage. And on the trial he explained the admitted shortage by saying that he took defendant's coal, flour, feed and other property and did not take money." "In the criminal action the court instructed the jury that to find defendant guilty it must appear that he embezzled money of the company, and not flour, feed, or coal."

Now it appears that on the trial Shong did boldly and safely testify. in regard to the unpaid accounts: "These accounts were flour, coal, and feed bought from the Atlantic Elevator Company. I owed these parties money, but I charged their flour, coal, and stuff to the Atlantic Elevator Company and made a receipt of it just as though I had no account with myself, but I made a verbal agreement with them that at the end of my year in the elevator I would pay the accounts, because I figured that I would be getting $200 from the Atlantic Elevator Company, and I was short and I wanted to pay these fellows, but left the accounts with the company and made a report to the company. The stuff was not charged to me. It was charged to them, but I had a verbal agreement that at the end of the year I would take up their accounts with the company."

Now, whether true or false, it was entirely safe for Shong to testify that he had reported to the company the ten unpaid accounts for goods sold to pay his own debts or to get property for himself. If untrue, there was no possible way of disproving it. Hence the word of Shong does not prove it. It is in no way convincing and the strong circumstantial evidence is to the contrary.

Here is his entry of two accounts:

Exhibit 631, page 32.
Herman Thiel account.

| July 16, C | $ 6.50 |
|---|---|
| July 16, C | 5.75 |
| Aug. 5 | 35.00 |
| | $47.25 |

Credits.

Aug. 2.  By Cash ..................................... $ 2.25
Aug. 2.  Paid to myself by rent ......................... 45.00
                                                        ─────────
                                                        $47.25

Here is the account of Louis Sonnenberg:

Exhibit 631, page 55.

Amount of Sales ..................................... $79.20
"  3-13.  By Check .................................. 51.15
"   "  3370#, 12.00 ................................ 20.00

Thus with coal of the company Shong paid his house rent, $45—and did it within two weeks after his employment. With coal of the company he bought hay, 3,370 pounds, at $12 a ton, and on the books of the company gave the seller credit for $20. In regard to the credit of $45, Shong testifies: "I made the entry. I gave him credit for that rent on account."

On the second entry he testifies:

"Q. Did you make that entry?  A. I did.

"Q. What does it mean?  A. *I don't know what it means.*

"Q. Is that 3,370 pounds of hay that Sonnenberg sold you?  A. I remember I did get some hay at that time.

"Q. And you gave him credit for that hay, did you not?  A. Yes, sir."

Now the court will note that at first he pretended he did not know what the account meant and finally, when pressed, he woke up and remembered that he did get the hay. Then he says that the ledger—Exhibit 631—in which the account was kept, was not the ledger of the company and that it was not shown to Mr. Stinchfield. Thus it seems he was keeping Stinchfield in the dark. And still this court is disposed to hold him responsible for not making to the state's attorney a full and true statement of the facts.

Then Mr. Sonnenberg is called as a witness. He testifies that the hay came to more than twenty dollars; that it came to twenty-two or twenty-three dollars, and that Shong promised to give him credit for it on the books of the Atlantic Elevator Company. "In August, 1918,

I gave him a check for $4.55. It was supposed to balance my account. After his arrest in 1918 he offered to pay me for the hay, saying that he did not turn that money over to the company. I did not take it. The hay was sold to Shong on March 13, 1918, and fed to his two cows by himself. He could not have forgotten it.

Now I do hold and affirm that the record clearly shows that Shong did embezzle the coal that he exchanged for the hay. Sonnenberg did not sell his good hay on time to an irresponsible person. He traded the hay for the coal of the company. Shong may have intended to pay the company, but he never did pay; and so it is with the other accounts amounting to $171.57. Certain it is that Shong was doing what is known as a crooked business and making in the books of the company entries that were purposely blind and misleading, and regardless of what he says, the chances are more then ten to one that he never reported to the company the unpaid accounts. That would have spoiled the game he was playing.

Mr. Justice Bronson says the record fully justifies the findings of the jury that the defendant did not make a full and fair disclosure of the facts to the state's attorney. Now the jury has made no such finding and the learned Justice does not attempt to show wherein the defendant failed to make a full disclosure. There is no showing that he intended to deceive or mislead the state's attorney or that he answered any question falsely. And now, with a record of two trials submitted to this court, I affirm that no two judges will agree on a full and fair statement of the facts.

Now I affirm that Judge Bronson does not correctly state the facts and he does cloud the case by stating a lot of irrelevant matter. The judge erroneously says: "Two juries by their verdict have held that the plaintiff was not guilty of the crime of embezzlement, and that there existed no probable cause to warrant belief of embezzlement of money or property." Now I do most solemnly affirm that is not true. In the first case there was no question of probable cause or the embezzlement of chattels. The court instructed the jury thus: "The defendant is not charged with the embezzlement of flour or feed. He is charged with the embezzlement of money and, therefore, the state must prove an embezzlement of money." In the second case—in the civil action—there was no legal question concerning the guilt or innocence

of the accused. The only question was "Did the complainant have reason to believe the accused to be guilty of any embezzlement?" Comp. Laws, § 10,531. And even though Shong had been perfectly innocent, the complainant might have had reason to believe him to be guilty. The questions are these:

(1) Did the complaining witness have reason to believe that Shong was guilty? If he did, then, under the statute, he was fully justified, and even required, to make the complaint.

(2) Did he make to the state's attorney an honest and fair, and not a deceptive statement?

(3) Was the complaint malicious and without probable cause?

By statute, if the complaining defendant had reason to believe that Shong had committed a public offense, it was his duty to make the complaint. Sec. 10,530. Then the duty of the state's attorney was to make a full investigation and inquire into the facts and to refuse to sanction a prosecution without probable cause. Secs. 10,629, 10,630. Of course the presumption of law is that the state's attorney did his duty, and likewise the presumption is that the complainant did his duty. The policy of the law is to protect those who honestly try to do a duty imposed on them by statute. If the complainant had reason to believe the defendant guilty of a public offense, his duty was to make the complaint. Sec. 10,530. He had a right to make to the state's attorney a fair, honest statement of the case and to act on his advice, and to leave the prosecution to the state's attorney—and that is what he did. And now he judges of this court are in a better position than complainant to state the case. And yet no two of them will read the records and the evidence and agree on what is a fair statement. One judge says on his word and oath that there was reasonable cause to believe the accused guilty, and that in trading the coal for hay he was guilty of embezzlement. Another judge says to the contrary. In such a case it is certain the majority may be wrong. The judges have no claim to infallibility. But it were a grievous hardship and a shame for the judges to hold that in stating the case to the state's attorney the complainant acted at his peril and that he was bound to make a statement in conformity with the views of the majority of the judges.

These are points on which it seems every judge should agree.

The record shows the plaintiff is by no means innocent of wrong-

doing. His conduct ill deserves commendation or reward. Defendants have done nothing worthy of punishment. Yet the verdict is so punitory and monstrous an affirmation of it would be to the court a monumental disgrace.