[File No. 7055]

EDMUND W. JOHNSON, Respondent, v. JOHN E. HUHNER, Appellant.

(33 NW2d 268)

Opinion filed March 18, 1948.   Rehearing denied July 10, 1948.

*E. T. Conmy* and *E. T. Conmy, Jr.*, for appellant.

16

*Lanier & Lanier,* for respondent.

BURKE, J. In his complaint in this action plaintiff alleged that defendant had maliciously and without probable cause filed an information in the County Court of Cass County, charging him with being an insane person; that plaintiff was arrested and taken into custody; that thereafter plaintiff was discharged from custody as a sane person and that by reason of the acts of the defendant, plaintiff had been damaged in the sum of $5,000.00. He demanded judgment for both actual and exemplary damages.

The defendant answered denying generally the allegations of the complaint and alleging that the information had been filed upon advice of counsel, without malice and in the honest belief that plaintiff was a fit subject for observation and treatment at the State Hospital for the Insane. At the trial of the action judgment for the plaintiff was entered upon a jury's verdict. The defendant has appealed from the judgment. Altogether there are twenty-five specifications of error.

We shall consider first the specification that the trial court erred in overruling defendant's motion for a directed verdict. The motion was grounded upon the contention that the evidence was insufficient to establish want of probable cause. The record disclosed that for some time prior to the incident which precipitated the filing of the information an atmosphere of animosity had existed between the Johnson and Huhner families although the adult members of the families had never met. In each family there was one child, a son approximately thirteen years of age, and the Huhners kept a dog, a cocker spaniel. As was to be expected there were times when the boys got along well together and times when they did not. However, it appears that

when they quarreled they did so with more than ordinary violence. This may be explained by the fact that the Huhner boy was afflicted with chorea. His mother testified that he would get nervous tantrums and would be hard to reason with, that the chorea affected his power of thought and led to irritability. In the Johnson yard was a lily pond completely surrounded by flower beds. This pool was a cooling spot in which Huhner's spaniel would play from time to time, with much damage, Mr. Johnson said, to the surrounding flower beds. One day when the dog came home after his sojourn at the pool, there was paint in his hair. It is evident that the Huhners assumed that the paint had been put into the pool deliberately and that they were incensed by what they thought was an abuse of their dog for Mr. Huhner went to see Judge Leonard who was a lawyer and also the Police Magistrate of Fargo, to inquire if some legal action either civil or criminal could be taken against Mr. Johnson. What advice he received on that occasion is not clear. It also appeared that upon one occasion Jackie Huhner had shot Mr. Johnson with an air rifle.

During the early afternoon of the day upon which the incident, with which we are particularly concerned, occurred, the Johnson and Huhner boys quarreled. Each boy gave his version of the facts. Jackie Huhner said he was playing in his yard with some friends and that Snooky Johnson called the dog and enticed him into the lily pond, which still had paint in it, by throwing a stick for the dog to retrieve. Jackie said he then warned Snooky not to do it again and that when Snooky did it again he went over to his yard to fight him. Snooky then went into the house and came out with a "bar". One of Jackie's friends then handed him a "bar" and when Snooky saw that Jackie also had a "bar" he went into the house and called his father. According to Snooky's version, he went out into the yard and found the Huhner's dog rolling in the flowers. He chased the dog out of the yard. Jackie Huhner and some of his friends then came over the fence into the Johnson yard and Jackie picked up an iron rod and "came with it." Snooky then went into the house and called his mother who told him she would have his father come home.

There are also two versions of what happened when Mr. Johnson came home. Mr. Johnson's testimony is "I drove in my driveway. I jumped out of my car. The Huhner boy was standing in the driveway, alongside the driveway and I walked up to him and I said 'Jack, I told you for the last time to stay out of my yard. I want you to get your dog out of my yard.' I said, 'if you don't, I am going to kill your dog. I am not going to tell you again.'" The Huhner boy replied, "If you kill my dog, I will kill Snooky." Mr. Johnson stated that he was angry and that his remarks were interspersed with curse words. In his version he is corroborated by his son and a neighbor who stated she heard what occurred. Mr. Johnson went into his house and a few minutes later Mrs. Huhner came over to see him. He testified, "I went to the door and asked her what she wanted, she said she wanted to talk. I said, 'What is it you want?' I said 'Anything you got to say, say it fast. I only got three minutes to get to work in.' She started to tell me I was insane, I was crazy and started off the porch. I told her to get to hell off my property."

According to Jackie Huhner, "Mr. Johnson came home, jumped out of his car and stood over me and started cursing me and shaking his fist and threatened to break my neck and kill me and the dog both." According to Mrs. Huhner, she was wakened from a nap by "violent cursing and screaming and yelling in the yard." "I went to the door and then I saw this man, I had never seen before in my life standing over our youngster. He was standing with both arms upraised in a threatening manner, and he was cursing and swearing, and his language was just terrible. As I came to the door, I remember he said 'you belong in Jamestown, and the first time I catch you and that God Damned dog in our yard again I will kill you.'" "I called Jackie and he came and I started over to find out what the trouble was about. I went over and rapped at the door. That man came to the door. I started to say something and he cut me short. He started screaming and yelling. He said, 'what in hell do you want? Are you looking for trouble?' He said, 'Speak up, speak up.' Because I was speechless at the looks of him. And then he said, 'All I want of you and the God damned S. O. B. of a husband of yours is to stay off my

property and if you don't I will kill you.' And I said to him 'You act like an insane person' and walked away."

Mr. Huhner testified that he came home about four o'clock in the afternoon of that day and found his wife "a nervous wreck". She was crying. When he asked what the trouble was, she recounted her version of the events of the day exactly as outlined in her testimony set forth above. Jackie told his father his story of the fight with the Johnson boy and subsequent events. On the basis of this information and the advice a neighbor had given him to have nothing to do with Johnson, he came to the conclusion that some action should be taken against Mr. Johnson.

He went to see Judge Leonard and told him that Johnson had threatened to kill his wife and son. Judge Leonard advised him to see the state's attorney. When he arrived at the state's attorney's office he found no one there so he returned to Judge Leonard's office. Judge Leonard then advised him to see the judge of the county court. When he arrived at the county judge's office, the judge was not in. He told the judge's clerk what he had told Judge Leonard. The clerk called the county judge on the telephone and repeated the conversation. The judge thereupon advised that Huhner execute and file an information stating that he believed that Johnson was a fit subject for observation and treatment at the State Hospital for the Insane. The information was made and filed and a warrant issued thereon. That evening the warrant was served upon Johnson. He agreed to appear for hearing before the insanity board the following morning and was not taken into custody. After a hearing the insanity board found that "Although this patient was not of normal temperament he was not a fit subject for observation and/or treatment at the State Hospital at this time." The hearing was continued indefinitely and "the patient was released on condition that he make no more threats or attacks on children." A month later the proceeding was dismissed upon the request of plaintiff's attorney.

An action will lie in this state for the prosecution, with malice and without probable cause, of a proceeding the object of which

is to have a person committed to the State Hospital for the Insane. Pickles v. Anton, 49 ND 47, 189 NW 684.

Here it is claimed that the existence of probable cause for the proceeding is affirmatively established by undisputed evidence in the case. Mrs. Huhner, Jackie Huhner and Mr. Huhner testified that Mrs. Huhner and Jackie had told Mr. Huhner that Mr. Johnson had threatened to kill them. Mr. Huhner testified that he believed their statements as to the threats and that in reliance upon such belief and the additional fact that one of the neighbors had previously warned him not to become friendly with Mr. Johnson he formed the honest conviction that Mr. Johnson was a fit subject for observation and treatment at the State Hospital for the Insane. Defendant points out that there is no evidence in the record directly controverting the above testimony and that it is therefore conclusive upon the question of probable cause.

In reviewing a party's specification that the trial court erred in refusing to direct a verdict in his favor an appellate court must consider the evidence in the light most favorable to the adverse party. Tvedt v. Haugen, 70 ND 338, 294 NW 183, 132 ALR 379; State ex rel. Brazerol v. Yellow Cab Co. 62 ND 733, 245 NW 382. We must assume therefore that for some time prior to the time Mr. Johnson made the alleged "threat" against Jackie Huhner, both Jackie and the Huhner spaniel had been sources of irritation to him. He had been painfully stung by a BB shot fired by Jackie, and his flower beds, to which he devoted a great deal of time, had been seriously damaged time and time again by the dog. Upon the day in question, he had been called home from work to protect his son from assault by Jackie with an iron rod. When he arrived home, he told Jackie in unjustifiable language, that if he didn't stay out of his yard and keep the dog out of the yard he would kill the dog. A little later, when Mrs. Huhner came to his house, not to find out what the trouble was, but to upbraid him for what he had done, he told her to get off his property. Assuming the facts to be as above set forth, his acts in ordering Mrs. Huhner and Jackie to keep off his property and to keep their dog out of his yard, were not unreasonable. His language, it is true, was opprobrious but it did not

constitute a reasonable ground for a belief that he was insane.

Probable cause for the institution of a prosecution, however, "does not depend upon the actual state of the case in point of fact, but upon the honest and reasonable belief of the party prosecuting." Merchant v. Pielke, 10 ND 48, 52, 84 NW 574, quoting from Bartlett v. Hawley, 38 Minn 308, 37 NW 580.

Since, upon the facts which we must assume there was no factual basis for the proceedings instituted against the plaintiff, whether probable cause existed or was wanting in this case depended solely upon the honest and reasonable belief of the defendant. Here the essential belief has two aspects, first belief in the existence of facts on which the charge was based and second, belief that those facts warranted the charge made. Whether probable cause exists is a mixed question of law and fact. It is for the jury to say what the facts are and it is for the court to say whether the found facts or the undisputed facts constitute probable cause. Redahl v. Stevens, 64 ND 154, 250 NW 534; Shong v. Stinchfield, 47 ND 495, 183 NW 268. The question of the existence of an essential belief on the part of the prosecutor is a question of fact. Kolka v. Jones, 6 ND 461, 71 NW 558, 66 Am St Rep 615; Pickles v. Anton, 49 ND 47, 189 NW 684; Shong v. Stinchfield, 47 ND 495, 183 NW 268, supra.

The burden was upon the plaintiff to prove want of probable cause. Mielke v. Rode, 58 ND 465, 226 NW 507. Since the proof is negative in character "it is considered sufficient if he (plaintiff) offer such evidence as, in the absence of counter testimony, would afford reasonable ground for presuming that the allegation is true." Greenleaf, Evidence § 78, Brown v. Selfridge, 224 US 189, 56 L ed 727, 32 S Ct 444. In Puutio v. Roman, 76 Mont 105, 245 P 523, it was said: "To prove want of probable cause is to prove a negative and the authorities hold generally that slight evidence is sufficient for that purpose." See Kolka v. Jones, 6 ND 461, 71 NW 558, 66 Am St Rep 615, supra, and Clapp v. Lahood, 78 Mont 551, 254 P 866. "The plaintiff is only obliged to adduce such proofs, by circumstances or otherwise, as are affirmatively within her control and which she might fairly be expected to produce." Brown v. Selfridge, 224 US 189, 56 L ed

727, 32 S Ct 444, supra. Here plaintiff's evidence, if believed and we must assume it was believed, established that there were no grounds in fact for believing that he was insane and that the testimony given by defendant's wife at the inquiry into his sanity was false. Clearly he could go no farther. What took place between the defendant and his wife in the privacy of their home and what beliefs were formed in the secrecy of defendant's mind were beyond the reach of his attack. We are satisfied therefore that plaintiff's evidence was sufficient, in the absence of any explanation by the defendant, to permit an inference of lack of probable cause or in other words that this evidence made out a prima facie case. In Brown v. Selfridge, supra, the complaint was that the defendant had caused a search warrant to be issued without probable cause, the evidence showed that the property which was the object of the search was not found. The court held that this evidence did not make out a prima facie case of want or probable cause but strongly intimated that if plaintiff had testified that the property had never been on her premises a prima facie case of want of probable cause would have been established.

A prima facie case having been established, the burden of going forward with the evidence and of offering testimony as to his belief in and reliance upon a non-existent state of facts was upon the defendant.

Defendant, his wife and son testified. They all agreed upon what defendant had been told and defendant testified as to his belief. The credibility of the wife and son was directly before the jury upon the irreconcilable conflict between their testimony and that of the plaintiff. In the testimony of defendant himself, entirely aside from his interest in the litigation, there were sufficient inconsistencies to put his credibility squarely before the jury. The following appears in his testimony concerning what he told Judge Leonard when he sought his advice:

Q. "Did you tell him that you knew that to be a fact?

A. That he threatened to kill them?

Q. Yes. A. I took my wife and boy's word for it, yes.

Q. Did you tell Judge Leonard that you knew it to be a fact?

Mr. Conmy: That is objected to as improper cross examination and argumentative.

The Court: I think it all goes to the question of probable cause. The objection is overruled.

Mr. Lanier: Q. I will reword it for you. Did you tell Judge Leonard, Mr. Huhner, that you knew as a fact that Mr. Johnson had threatened the life of your boy and your wife?

A. Yes.

Mr. Conmy: Did you understand that question?

Mr. Lanier: If the court please, the witness is answering the questions.

The Court: Mr. Conmy may inquire.

Mr. Conmy: This witness is hard of hearing.

The Court: Mr. Conmy may inquire for the purpose of objection.

Mr. Conmy: Did you understand that last question?

A. I didn't quite get the drift of what that question was.

Mr. Conmy: Let's have it repeated. The witness can't hear very well.

A. I did not tell him.

Mr. Lanier: Q. Your answer is you did not tell him.

A. Yes.

Q. Do you understand the question now? A. Yes.

Q. Then the first time when you answered me that that is what you told him, you misunderstood the question?

A. That is right.

Q. Now you testify that you did not tell him that. What did you tell him?

Mr. Conmy: That is objected to as repetition. He has already testified.

Mr. Lanier: I want to know exactly what he told him.

Mr. Conmy: You asked him that before, and he answered it.

Mr. Lanier: The question has been asked. I would like to have an answer.

The Court: The witness may answer.

A. I told him that my wife and boy told me that Johnson had threatened them, and I wanted to know what to do." In his testimony, Judge Leonard stated that Huhner did tell him, as a fact, that Johnson had threatened to kill his wife and son.

It is clear that the jury could have come to the conclusion that defendant did understand the question. In the first instance he supplied an important part of the question himself and in his answer explained why he had told as a fact that Johnson had threatened to kill his wife and son. The question was reworded to make it more specific and again defendant answered in the affirmative. Then without having the question repeated he testified that he didn't "quite get the drift" of it. He thereafter answered in the negative. Without going into the question of the materiality of the change as a matter of law, it is evident from the record that it was considered material at the time. The jury might very well have inferred not only from what he said, but from his manner of saying it, that defendant was not completely frank with regard to this matter and therefore not reliable in general. If they did draw that inference, it was a proper exercise of one of their functions as jurors. If the jury did not believe defendant's testimony, the permissible inference lying in the prima facie case remained unimpaired.

When all the testimony in the case was in, there was evidence of additional facts and circumstances which it was proper for the jury to consider in drawing an inference that defendant did, or did not have a belief in the facts related by his wife and son and whether that belief was reasonable. Some of these facts were favorable to the plaintiff, others were favorable to the defendant. It will serve no useful purpose to catalogue the facts favorable to each party. It was for the jury to weigh this evidence and to say what inference it warranted.

In Siefke v. Siefke, 6 App Div 472, 39 NYS 601, it was said: "We come back, then, to the question whether, upon all the evidence in the case, on both sides, the jury would have been justified in drawing the inference, and finding the fact, either that the defendant did not believe the plaintiff guilty, or, if he did

so believe, still that he had no reasonable grounds for such belief; and in considering this question, the evidence of the defendant as to what his honest belief was should be disregarded, because the jury had the right to disbelieve him, and to pass upon the question, regardless of what he testified to upon the subject." In Stewart v. Sonneborn, 98 US 187, 25 L ed 116, the Supreme Court said: "It is, therefore, generally the duty of the court, when evidence has been given to prove or disprove the existence of probable cause, to submit to the jury its credibility, and what facts it proves, with instructions that the facts found amount to proof of probable cause, or that they do not. Taylor v. Willans, 2 Barn & Ad 845, 109 Eng Reprint 1357. There may be, and there are, doubtless, some seeming exceptions to this rule, growing out of the nature of the evidence, as when the question of the defendant's belief of the facts relied upon to prove want of probable cause is involved. *What their belief was is always a question for the jury.*" (Italics ours) To the same effect are Boyer v. Bugher, 19 Wyo 463, 120 P 171; Atchison, T. & S. F. R. Co. v. Watson, 37 Kan 773, 15 P 877; Jackson v. Bell, 5 SD 257, 58 NW 671; and many other cases collected and cited in the annotation in LRA1915D at page 79 et seq. See also Shafer v. Hertzig, 92 Minn 171, 99 NW 796; and a recent case of Jones v. Phillips Petroleum Co. (Mo App) 186 SW2d 868. We are satisfied therefore that this case was properly submitted to the jury.

The defendant urged as a defense in this case that he had acted upon the advice of counsel. Evidence that he sought such advice is in this case relevant only to the question of his good faith. That is to say, the facts upon which defendant claims to have relied are such, that if he reasonably believed them, and honestly believed plaintiff was a fit subject for treatment at the hospital for the insane, he would have had probable cause whether he consulted an attorney or not. If he did not so believe there was no probable cause.

The defendant also had specified error upon the trial court's instructions to the jury. It is claimed it was error for the trial judge to charge, "And further, if it be shown that there was want

of probable cause for the prosecution, the law implies malice from that circumstance." This instruction was clearly erroneous. The law never presumes malice although in a proper case its presence may be inferred from want of probable cause. Kolka v. Jones, 6 ND 461, 71 NW 558, 66 Am St Rep 615. The inference is one of fact which may be drawn only by the jury but not one which they are required to draw. 34 Am Jur 775, Malicious Prosecution; 38 CJ 507. The error is clearly prejudicial and accordingly a new trial must be granted.

As the other errors, specified by appellant, relate to matters which we consider unlikely to arise upon a retrial of the case, we deem it unnecessary to consider them.

Judgment reversed and a new trial granted.

CHRISTIANSON, Ch. J., NUESSLE, J., and GRIMSON, District Judge, concur.

BURR and MORRIS, JJ., not participating.

BURKE, J. (On Petition for Rehearing). Defendant has filed a petition for rehearing in which he asks a reconsideration of the question of the sufficiency of the proof of want of probable cause and a decision upon questions of law raised by certain specified errors which we considered but deemed it unnecessary to discuss.

Upon the question of the sufficiency of the proof of want of probable cause, the petition offers nothing new for our consideration and our views on that question remain unchanged.

First among the additional questions we are asked to decide is that of the effect to be given to the findings of the Insanity Board. Concerning the plaintiff the Board found, "Although this patient was not of normal temperament he was not a fit subject for observation and/or treatment at the State Hospital at this time. . . . the patient was released on condition that he make no more threats or attacks on children." Defendant contends that by this language the board, in effect, found that the plaintiff had threatened to kill Jackie Huhner and that such find-

ing is conclusive upon the question of probable cause. Assuming that this language may be construed as defendant contends, it, nevertheless, would not have the effect he would have us give it. The effect of the order was to continue the hearing for further investigation. Clearly the finding contained in the order, if it was such, was not intended as final. In criminal causes, neither the binding over of an accused after a preliminary hearing nor an indictment of an accused by a grand jury is more than prima facie evidence of probable cause. It is doubtful if the order in this case would be of equal effect, certainly it could not be of greater effect.

At the close of plaintiff's case the defendant moved the court to direct the jury to return a verdict for the dismissal of the action upon the ground that there was a total failure of proof to sustain the allegations of the complaint. Specifically the ground for the motion was that there was a fatal variance between the allegations of the complaint and the proof adduced in support thereof. Plaintiff had alleged the defendant had charged him with being an insane person and the proof established that defendant had alleged that plaintiff was a fit subject for observation and treatment at the State Hospital for the Insane. We see no material variance. Sec. 25-0307 Rev Code 1943 provides: "An application for admission to the state hospital shall be in the nature of a written information and it shall be verified. Such application shall be addressed to the insanity board of the county in which *the alleged insane person* resides and shall allege that the person in whose behalf the application is made is:

1. Believed by the informant to require treatment and observation at the state hospital;
2. A fit subject for treatment and observation in such hospital; . . .
3. . . ."

From a consideration of the above section, it is apparent that in the information filed, the defendant alleged insanity in the statutory language.

Several errors were specified upon the trial court's rulings upon the admission of testimony. The first of these relates to

the hypothetical question which the witness Leonard was allowed to answer over defendant's objection. Defendant had testified that he had sought the advice of Judge Leonard, an attorney at law. He stated what he had told Judge Leonard and what advice he had received. Judge Leonard also testified as to defendant's statements and the advice he had given. Upon cross-examination plaintiff's counsel asked Judge Leonard to assume that defendant had related to him an entirely different state of facts and answer what his advice would have been had such state of facts been presented to him. Judge Leonard prefaced his answer with the remark, "that is assuming a different question from what was ever asked me" and then stated, "I would have advised him differently." There was no possibility, under the evidence in this case that the state of facts which the witness was asked to assume could have been related to him as a basis for his advice. The question clearly called upon Judge Leonard to speculate upon a supposition which could not have existed under any view of the evidence. It therefore called for testimony which was inadmissible. 32 CJS 87.

As a part of his case in chief plaintiff was permitted, over defendant's objection, to testify as to certain statements made to him by Jackie Huhner and Mrs. Huhner at a time prior to the incident which precipitated this controversy and not in the presence of the defendant. This testimony was admitted upon the theory that in an action for malicious prosecution, it was admissible, under an exception to the rule against hearsay, to show the background of the dispute between the parties. We know of no such exception to the hearsay rule and no instances of the approval of such a rule have been cited to us. The testimony was clearly hearsay and should have been excluded.

Defendant specified error upon the trial court's refusal to permit the individual members of the insanity board to testify as to the separate conclusions they had formed at the inquiry into plaintiff's sanity, as to whether the plaintiff had in fact threatened to kill Jackie Huhner. The contention of the defendant is that this testimony was competent to explain the board's inter-

mediate order continuing the proceeding and releasing the plaintiff on condition that he make no more threats against children. It is stated in the brief, "That this is most vital testimony . . . and it is perfectly proper in view of what the Board did say. It is not contradictory of the record, but explanatory of something that should be explained and something that is most vital . . . on the question of probable cause. If the Board actually and affirmatively found that plaintiff did threaten to kill the boy, then there was probable cause." We have said above that such a finding would not be conclusive upon the question of whether such threats had actually been made. That question was an open one for the jury in this case to decide. Their finding upon this issue depended upon the degree of credibility accorded to the testimony of the plaintiff and his witnesses on one hand and that accorded to the testimony of Jackie and Mrs. Huhner upon the other. The proof offered would, in effect, have called for the separate opinions of the members of the Insanity Board upon the truth of the testimony given by Mrs. Huhner in the insanity proceeding. This was not a proper subject for opinion evidence. The offer was therefore properly rejected. Wigmore, Evidence 3d ed § 1924.

Defendant also predicated error upon the trial court's refusal to give certain requested instructions. The first of these was a request for an instruction to the effect that defendant had not charged that the plaintiff was insane and that there is a vast difference between charging that a person was a fit subject for observation and treatment at the State Hospital for the Insane and charging that such person was insane. We have said above that the effect of the information filed by defendant was to allege insanity in the statutory form. This instruction was therefore properly refused.

Defendant requested the trial judge to give two separate instructions defining malice. Both were refused and error is specified upon the refusal. In his brief defendant states:

"We can concede for the sake of argument that the court's definition of malice in the charge given was proper and would stand in the absence of any specific request for a further charge,"

and "Our right is to have specifically requested instructions given where they correctly state the law unless the equivalent of the requested instructions is fairly and properly stated to the jury."

Defendant, however, does not point out in what respect he considers the charge given fails to measure up as the equivalent of the requested instructions. We have considered the charge carefully, and while its phrasing differs from that of the requested instructions we are satisfied that it is at least their equivalent in defining and explaining to the jury the nature of the malice which must be established in a case of malicious prosecution.

The petition for rehearing is denied.

CHRISTIANSON, Ch. J., NUESSLE, J., and GRIMSON, District Judge, concur.